Let's see, our last case of the afternoon is 4-14-0307 and 0308, People's State of Illinois v. Michael Connor. Attorney Johnson is here on behalf of the appellant. Attorney Brooks is here on behalf of the appellee. Mr. Johnson, are you ready to proceed? All right, you may do so. May it please the court? Counsel. Counsel. My name is Doug Johnson. I represent the appellant, Michael Connor. Mr. Connor was convicted of multiple counts of predatory criminal sexual assault, and he is serving life in prison. I'd like to address, first, the second issue we raise, whether or not he was proven guilty beyond a reasonable doubt. I'm well aware I face a very high burden before this court with such an argument, but I think here a close review of the record shows that that standard was not adhered to in this case. There was no physical evidence. I know there doesn't have to be. There was none.  And what we have here is lengthy pretrial videotaped statements, out-of-court statements, and some brief trial testimony. And when this court reviews this case, they sit, Your Honor, sit in a little different position than most, I believe, because you can watch the videos yourself. And with the trial court's comments, the trial court paid very close attention, or said it did, to those statements. They reviewed those. The court looked at the same thing you did. And I think to keep in mind the beauty of this process, the beauty of a trial, how we identify the truth, is that the truth doesn't change, but here the truth changed. And I submit to you because it wasn't the truth at all. It was false. I don't, by anything I say, mean to attack these children. We believe they were pawns. Who knows if they believed what they said. But the stories they told cannot, by any reasonable finder of fact, have been concluded to be what happened. And I'd like to compare just briefly the child advocacy center videos to the trial testimony to point out and highlight a bit what the changes were. There were numerous minor changes and some major ones between what was said to the forensic examiner on August 26th of 2011 and the trial. With regard to Zoe, the older child, she said at the child advocacy center, I was molested once. Pardon my language. He put his pee-pee in my pee-pee, he put his pee-pee in my mouth, he put his pee-pee in my butt. A very, very traumatic, I think we can all agree, situation, episode. And then by the time we get to trial, there's another one. That can't be. All of a sudden, after years, there's now another predatory criminal sexual assault. She, in the cases I believe, children, we don't hold them to any standard, we don't hold them to any specificity. I understand the reality of it. But a man is sitting doing his life in prison based on something where these children could not give any degree, any detail, anything that says to you, yeah, this really happened. Zoe, she said it happened once, at trial she said twice. At the child advocacy center, she never used the term rape. At the trial, first thing out of her mouth, he raped me. How much older was she at the trial? Two years older. So how old was she at trial? I believe she was 11. She was years older, I don't know exactly how much. But the other thing she said, at the child advocacy center, she said it happened in the afternoon. She initially said that at the trial. She said it happened in the morning. There should be a vision, no matter how young, there must be a vision when something as awful as one can imagine happens. They should be able to picture it if it is true. Zoe said, when he was done, he said, be quiet, we're done. That's what she said at the child advocacy center. At the trial, he said, go to the bathroom. At the child advocacy center, when asked, where was your mother when this happened? She said, mom was at work. At the trial, she said, I don't know where mom was. Just two more. At the child advocacy center, when asked if there was blood anywhere, and I will get briefly to the physical evidence, which there was none, I believe there was physical evidence of innocence. But when asked if the child advocacy center was there blood, she said, I don't know. It hurt so much, when I tried to look, I couldn't bend over. It hurt for a long time. She didn't know if there was blood. By the time she got to trial, there was no bleeding whatsoever. She said twice, for sure, there was no blood. And that fit real nicely with the state's theory. And then most importantly, at the child advocacy center, everything is up in smoke for the state at the end. When Joanne Sipes says, now when did it happen? And she says, after Michael and Amanda broke up. That's it. Right there. That can't be true, because the whole story was that back in 2008 and 2009, I, Michael, daddy, molested me, and Amanda, mommy and I confronted Michael, and he said it didn't happen. Now, Zoe is telling the examiner, it happened after Michael and Amanda broke up, they weren't living together. Well, that can't be. Is she talking about the second incident? No, she's talking about the first one. I think it's very clear with Joanne Sipes, she is talking about the first incident. And you can see it on Joanne Sipes' face. She is, this throws her, she's a professional, not a lot throws her, but you can look at her and she thinks, well, wait a minute. In her language. And then for the next four or five, it's a cross-examination. She says, are you telling me it happened after Michael moved out? Yes, I am. Yes, I am. And finally, at the very end, it switched around. And Zoe says, no, while they lived together. Were you trial counsel? I was not. But you looked at this record, obviously. Weren't all of these arguments made to the trial court who was trier of fact? Not all of them. Not all of the points I'm making right here, it was in the record. But what was argued by the state was that they were consistent, the stories were consistent. It's not true. Well, we have an experienced trial judge who's called upon as trier of fact to evaluate all of this. What part of the alleged inconsistencies weren't available or apparent to her as she evaluated all of this? Well, let me, the available to her, I must concede they were available to her. Had she reviewed this like I've reviewed it, you can see. But one of the reasons I've chosen my limited time here to point these things out is because I don't think it was done. It has to be a systematic analysis of the video to the trial testimony before no reasonable trier of fact can say these are consistent. And I will also, with all due respect to the trial court, I don't believe that the reasoning process that was engaged in here was reasonable at all. And I think it's like one of the comments made is like no comment I've ever seen before by a trial judge. Well, she spent two days post-trial evaluating all of this and then made findings in 18 pages of transcript. And as you know, they would have been adequate to have simply said guilty. We have a trial court who explained in great detail. Doesn't that suggest that she's paid careful attention to all of this? Let me skip to answer your question. We do not, she does not have to say anything but guilty. And with a jury verdict, we have some jury instructions and then we'd always see as guilty. Here, thankfully, I certainly appreciate it. I think all defense attorneys do when they see the reasoning. That said, the reasoning is flawed. And I'll start with the flawed reasoning with regard to the third issue we raised and that's shifting of the burden. Here is what she said. And this has to do with the chlamydia because Lacey had chlamydia when tested. Michael did not. And it makes me think about how the law used to be recognized this is the easiest accusation to make and the hardest accusation to defend against and how it used to be when you have a complaint. And I believe it has to be clear and convincing, a different burden of proof, which we don't have anymore. But what the judge said with regard to the chlamydia that Michael did not have during the time period that he's charged, he's charged with August 26th of 2010 through August 26th of 2011, he assaulted Lacey. So when he proves that in October of 2010, he did not have chlamydia, the court says, I recognize the defendant tested negative for the disease in October of 2010, but there was no evidence to suggest that he could not have had it earlier in the year when the alleged sexual assault occurred. Could we see a more blatant statement of you, Mr. Defendant, have to prove to me you're innocent? That is a burden shift. We don't have to look like if a prosecutor had said that, I submit that we would say, well, that's clearly a burden shift. Now let's see if the defendant was substantially prejudiced. Well, why isn't there simply an evaluation of what the evidence shows? Because she's asking, just like the Gia Grande case, she is asking, that's saying where is the evidence the defendant didn't do it? He doesn't have it during the time period in question, and she's saying, well, give me another chlamydia test. Give me somebody up here to tell me that they didn't have chlamydia, they had sex with you. Show me that you didn't have it for the entire time period. She goes on to say, the trial court goes on to say, where is the evidence that he had not been on any antibiotics at all during that time that could have cleared it up? He doesn't have a burden to provide anything. He chose to. He had basically what I would suggest is an alibi by some definitions. He is saying it could not have been me. Yet this shift, she is saying, prove to me your innocence. And it's consistent with the other things with regard to the trial court's reasoning that she did throughout the trial. For instance, with regard to the defense argument, OK, Zoe's testimony at trial was disconclusory. All she did up, got up there, and all she said was PP, et cetera. No detail. And the court said, well, she did give more detail at the child advocacy center. But you see, that's because at the child advocacy center, it would contain greater detail than trial testimony. Because the CAC interview was closer in time to the abuse. And this is referenced on page 17 of the state's brief. OK, let's assume that's true. Now let's take another argument by the defense. Well, wait a minute. Lacey, when she came forward at the trial, she said something she never said before. Oh, and he put his PP in my butt. Never said that before. Before it was PP in PP, PP in mouth. Now she just adds that in. Throws in another predatory criminal sexual assault. And since she also added at trial what she'd never said before, it happened lots of times. We might be throwing in several. Your argument challenges the credibility of the victims. But this court doesn't assess credibility. I understand this court doesn't assess credibility. But what this court has now is the videos, but more importantly, a look at the trial judge's reasoning, which is flawed. She shifted the burden. And as I was going to point out, with regard to Zoe, the court explains, here's why I believe Zoe. Let's listen to how, if I could, how the court now said Lacey. The defense argued, well, with regard to Lacey, she added an allegation of anal intercourse at trial. The court said, well, defendant claims, the court said, it seems logical that more details would come out the more that a child talks about the abuse. So apparently what's good for the goose is not good for the gander. We will explain Zoe. The trial court will use the reasoning, Zoe had more detail at the Child Advocacy Center because it was closer in time to the abuse. Lacey had more detail at trial because more is going to come out. This court should not defer to that type of reasoning process. And as one other example of why this court should look very closely and engage in a review, look at these videos, look at this testimony, because the court, I'm not talking about other cases, I'm not talking about the judge, but for whatever reason, this was an extremely flawed reasoning process. How about here? Again, in this type of case, the date, of course, is not a material element of the charge. I know that the state cannot be charged with saying, yes, well, our victim will get up at her age of six and tell you that she was abused at 104 Maple Lane at 7 o'clock at night, right after dinner, in the bedroom, just after we reported, whatever, nothing. But there has to be something. And this trial court, when all was said and done, didn't have a clue about when this occurred. Couldn't put any kind of detail on that at all. Was confused because here's what the court said. At one point in the long, lengthy ruling, which we're very thankful for because it shows us what the court was thinking, the court said, the abuse happened a few months before Lacey's August 11th interview. Okay. First of all, that's when he didn't have chlamydia. But then the court said later, when talking about the chlamydia, well, the abuse happened earlier in the year of 2010. That kind of reasoning, however long this court took, and I understand there was a duration. The court didn't just rule after the evidence. But whatever the court was doing, it was not reasonably evaluating the evidence. It happened, here I'm going to find this gentleman guilty beyond a reasonable doubt because it happened a few months before August 11th. And then in the same, a few pages later before, it happened earlier in the year of 2010. I mean, this was not a case where he was proven guilty beyond a reasonable doubt. This is a case where he wasn't given any benefit of the doubt. The physical evidence. I understand the experts sparred with each other. We had a man who had been 82 years old, 50 years experience, testified in states all over the country. And then we had someone who, for the state, who I guess had gotten a degree a few years earlier. And who was clearly, and maybe the defense, someone could say, well, your defense could be a higher gun. I don't know. But clearly the state's expert was prosecution minded. That was where her paychecks came from. In any event, they got into a discussion about penetration and what it means under the law. We all know penetration, however slight, is sufficient for this charge. I understand that. And so the state argued, well, see, penetration, however slight, could make him guilty of predatory criminal sexual assault. And with that, you're not going to see any damage to the six-year-old child because it's just penetration, however slight. Counsel, you argue in support of your position in the case of the second district six years ago, People v. Learn. The second district a year ago pointed out in a majority, the majority pointed out in People v. Kennebrew that no decision decided Learn approvingly in the last six years. And it's been the subject of many decisions which have rejected its analysis. And in a special concurrence, Justice Shostak of the second district wrote the following. The reason why our courts so abhor that case is obvious. Learn was wrongly decided. What are you asking us to do here if not follow that case and disregard what's happened, including the second district, in zoning its own earlier decision? And may I ask, Judge, the Learn? I'm at a loss right now for the Learn. People v. Learn cited in page 39 of your brief for the proposition that there's, it is clear there's no corroborative evidence of any act in the witness's statement. This is where the witness testified from the witness stand, and the only evidence of guilt came in the 115-10 statements. And the argument was that's insufficient and inadequate, and the statements can't be considered by themselves. And that's been not followed since. I did not believe it's been overruled. Well, it's been disputed, and the second district has not followed it, and many other cases have disputed it, and I doubt that we're going to be the first that is going to cite it approvingly. But the other thing is, with regard to your argument about prior consistent statements, I'm not sure I understand what you're saying in your reply brief. This court in People v. Stoll said that the argument about prior consistent statements doesn't apply to section 115-10. Yes, I understand it was a hearsay exception. So it falls in substance. But you seem to be saying, well, that's a, you know, it doesn't matter, it's still improper. Wouldn't we have to accept your argument? Wouldn't we have to overrule what this court ruled a year ago in Stoll? Stoll, first of all, I believe the facts of Stoll are quite different. Where a child made a spontaneous outcry to teachers with great detail. The point of law is prior consistent statements doesn't apply to statements offered under 115-10, whatever they may be. For all intents and purposes, these children were unavailable. They did testify at the trial. I understand Your Honor's point. In this situation, these children were unavailable. Therefore, corroborative physical evidence was required, and it was certainly not there in the case of the Chlamydia. But that's a different issue. That's a 115-10 issue. The issue I raise is your argument that prior, the rule against the admission of prior consistent statement applies here to 115-10 statements. I do agree. We rejected that in Stoll. I do agree. Okay. Go ahead. With regard to the physical evidence, I would say these children said, the male penis was inside me. So the argument about whether it was penetration could be however slight. These children said, male penis, it was inside me. In Lacey's case, several times. These are little girls. If you look at the expert testimony, both seem to agree little girls with no estrogen would, certainly this defense expert would show evidence of damage, and it's almost common sense. An adult male penis inside me lots of times, we're going to see something, or there would be blood, but there was none of that. So the argument about penetration, that isn't it. These girls said it was very painful, it was inside me, and it hurt. There's simply nothing here but inconsistent statements. And where the trial court found that these statements are consistent, that is just simply wrong, and we can see how it got there because of the trial court's lengthy discourse. We didn't have more time on rebuttal, but you're out of time right now. Thank you. Ms. Brooks? Good afternoon, Your Honors. May it please the court and counsel, my name is Allison Paige Brooks, and I'm appearing on behalf of the people. With respect to sufficiency of the evidence, this case, the trial court found the children to be credible and saw no red flags of coaching, and also found that the mother, Amanda, was credible, and then also found that the defendant not to be credible. So this case contains many credibility determinations which were central to the trial court's finding of guilt beyond a reasonable doubt. It's something that this court is not going to be engaged in second-guessing, the credibility determinations of the trial court. I understand that this court can review the child advocacy recordings, just like the trial court did, but the trial court also viewed all of the trial evidence in the form of testimony from the witness stand, which is something that this court does not have the benefit of doing. So the children did also testify at the trial, so that's the situation. Is it your contention that our standard review is the same, even though we have the tape available? Even though part of the evidence is available for this court's review, it does not change the standard review in a criminal case that this court would ordinarily apply. That's the state's position. So the trial court was particularly impressed with the demonstration and gestures used by the children that is evidenced on the recording at the child advocacy center, and the specificity of those gestures and demonstrations lent credibility to the statements. In other words, the trial court took the view that this was not a situation where Amanda could have feasibly imparted all the information about sexual acts and the related gestures in order to have these children repeat that for the benefit of investigators in order to implicate the defendant in a crime that did not occur. The defendant's position is that these children were pawns and that this was all made up by Amanda as part of a scheme to do something to the defendant because of their disputes in their relationship. However, the initial outcry came from Zoe before the breakup, so it's not a situation where Amanda then engineered that. And also with respect to the 115-10 issue, the circumstances in which this came out, Amanda did not believe Zoe's initial complaint about sexual abuse at the hands of the defendant. Then years went by, and when Lacey started showing behavioral problems, not all of which were sexual in nature, but was sent to a psychiatrist and then became referred because of daily masturbation, decided, well, there was questioning as to whether she had, the mother thought that the girl had been sexually abused and there was a denial, but then because of that sexualized conduct, there was a referral made for Lacey to go see a sexual abuse counselor. And then as that is the moment, then Amanda goes back to Zoe, who had made the outcry earlier, the older child, and says, do you remember what you said before? And then a consistent statement is made again by Zoe, repeating what she had said years earlier, and then consistently again at the Child Advocacy Center. So there's consistency, there's age-appropriate language, and there's no suggestive questioning. And I understand the defendant's argument to be, well, there was mentions about body parts and questions about whether these children were touched on those body parts. But that's not suggesting that this defendant had touched the victim in a particular location. So that was not suggestiveness. What about the argument Mr. Johnson made about shifting the burden of proof? Right. So shifting to that argument, the trial court merely recognized the limitations of the stipulation. The stipulation was that on October 16, 2010, the defendant tested negative for chlamydia, is one of the tests that was tested for. So that showed a snapshot on that date, the defendant did not have a detectable chlamydia infection. That's the evidence before the trial court. And then, of course, the trial court, in making these statements at the end of the trial, not during closing arguments like by a prosecutor, but this is after the trial courts received all of the evidence in the case and found the children to be credible, et cetera, and especially knowing, based on Nurse Hoffman's testimony, that the positive chlamydia test for Lacey was a strong indication that Lacey had, in fact, been sexually abused. So knowing all of that, the trial court then surmises that, well, there is no evidence that the defendant could not have had the chlamydia infection before October 16, 2010 or had taken some antibiotics that would have cleared it up. So in that context, there's not the same as the trial court asking, where's the evidence that the defendant is innocent? Because that is the sort of thing that would be considered to be an implication that the defendant was required to present evidence. Here the defense elected to present evidence, and the trial court found that evidence to be very wanting in terms of its probative value. It simply showed on one date the defendant did not have a detectable chlamydia infection.  It's not proof of innocence. The charge pertained to a range of dates, an entire year, when Lacey was six years old, from August 26, 2010 to August 25, 2011. So it does not say that... When was this test done? The test was October 16, 2010, which is about a little less than two months into that period. So the defense says that that means that he tested negative during the time period, but that's not really what the test showed. It showed that on one day during an entire year, he did not have detectable infection. So this is not like an alibi, and if it were an alibi, when the charged crime pertains to something that could happen over the span of one year, and the defendant shows where he was, for example, if this were an alibi, according to the defense analogy, if he shows where he was at any one moment in time during that entire year, that's a sufficient alibi. That's the defendant's position, and that's not like an alibi. That's not like an effective alibi. He wasn't living with Amanda, though, during any of that time period, is that correct? For Lacey's charge, which was starting August 26, 2010, I do not remember specifically when they broke up. It seems like Johnson testified she lived with the defendant from May of 2010 to October of 2010. Well, then that would be after... Lacey's conduct would be after the breakup. But he did have visitation rights. So they were at his house in his bedroom during that time, even though it was after the breakup. And I understand there was some dispute as to the timing of these offenses. With respect to the fatal variance issue, Lacey said in her August 2011 Child Advocacy Center interview that she was six at the time, and it was summertime, but then she also shook her head negatively when she was asked if it was this summer, meaning the summer of 2011, which means because she was six years old in the summer of 2010, after she turned six years old on August 26, 2010, that means her abuse would have been in that summer of 2010, which was before the negative test for a committee for the defendant. With respect to Zoe, there was some confusion as well in her Child Advocacy Center interview at the end of the interview with respect to when the offense occurred, but realizing she had initially made this outcry to her mother really soon after the event, but was disbelieved because the mother thought that Amanda thought the defendant was a good father, even though it wasn't... Zoe was not his, but that he was acting as a good father to her. So she did not seem inclined to believe this complaint by Zoe. So it lay dormant for years. And that's why there could be some confusion as to when this actually happened, because Zoe is speaking after the fact by a couple years after she was abused. And so looking back, again, even at trial, the development of her story, it does go both ways. There is a situation where a child keeps talking. The more the child talks, the more details come out. And it's also the case where the child is going to be more clear about something that happened recently during their earlier interviews. So the defense thinks that's kind of an inconsistency, but it's actually both concepts apply. A child that talks more is going to come up with more detail, and a child that talks earlier is going to perhaps remember better than testimony during a trial years after the fact. So there is some physical evidence, as I said. The defense denies that there is any, but the physical evidence is in the form of positive chlamydia culture, the vaginal culture that was tested for Lacey. Nurse Hoffman opined that that was evidence that she was, in fact, sexually abused. And the references in the disputes as to whether the defendant was... Well, both experts agreed with that pretty much, correct? I'm not sure what Dr. Harrington said to that reference. It is sexually transmitted. I think it may be highly unlikely that the child could have got the disease in any other fashion. If it was transmitted, like, through birth, it could have cleared up by the time they reached child six, because that's not ever really been observed in any case. So we'll get to the sufficiency of the evidence. The idea that there was pain and that the children had said that the penetration was inside them, penetration could be inside the labia and touching the hymen and still cause pain or still cause a sensation of fullness, according to Nurse Hoffman, and young children interpreting that as actual penetration in the medical sense, which was used by Dr. Harrington. But the legal definition of penetration, which has to be used in the context of the charge, which is contact between the sex organs no matter how slight, so one sex organ versus another sex organ, the contact, however slight. So Dr. Harrington was willing to grant that the defendant's penis could have touched the hymen of the girls. Touched is all he would go, because he said if it actually went inside prepubescent girls, hymen would not stretch far enough to accommodate an adult male penis, and therefore it would have been observable evidence of trauma of which there was none. So therefore, Dr. Harrington's testimony forecloses the possibility of penetration inside the hymen, but that's not an element of the proof that's required. So that's why Dr. Harrington's testimony is not exonerating, and that the victim still could have experienced pain and described penetration inside of them and still not have any observable evidence of trauma after the fact. So the fact is the defense says that the truth changed and that there was some inconsistencies. It's not the case that the only reasonable inference from those inconsistencies is that these girls were manipulated into lying or telling stories about things that never actually happened. That has to be the case in order for this court to overrule the trial court's finding and reverse on the grounds of sufficiency of evidence, because this court has to review the evidence in the light most favorable to the state, which means taking all reasonable inferences in favor of the state. So it has to be the case that it's the only reasonable inference that favors the defendant in order for that to be accepted by this court on review. Also, this court reviews the judgment of the trial court, including whether that record evidence was sufficient to convict. So even if there are some deficiencies in the trial court's reasoning, that's not a basis for this court to have to overrule the trial court's judgment if the evidence that was admitted is sufficient. So, I just want to make a few more minor points. With respect to the impeachment, the trial court did decline to object. The evidence was admitted, excuse me, People's Exhibits No. 6, 7, and 8, which were the medical articles, were admitted only for the purpose of impeachment, and that was fine with the defense. And so the defense didn't really complain below that they should have, in fact, agreed to that procedure rather than complaining that somehow the prosecution should have been required to confront the defense witness on the stand with every single item inside those articles. And with respect to limitation and cross-examination, that was ruled to be a suspected attack because this meeting occurred in June 2011. Amanda didn't call the police until two months later. And the question was about Amanda's debt to the defendant's mother, quote, at that point in time. So it was remote, not with respect, not a debt in existence necessarily around the time that Amanda actually called the police. And the defendant does argue a new theory of relevance for the first time on appeal because initially the claim below was that she called police in retaliation and now the defense theory is blackmail. So there is a development there. So for these reasons, the state requests this court to affirm the judgment. I'm willing to entertain any other questions. I don't see any. Thank you, Ms. Brooks. Mr. Johnson, any rebuttal? With regard to the last point about barring questioning of Amanda about the money she may have owed Ms. Connor, it is my understanding of the law that cross-examination is a fundamental concept of our system. And I see no reason whatsoever to bar that inquiry. This would show bias. The defense theory the whole time was that Amanda did this, engineered this. And I do want to make a few comments about Amanda. I hadn't mentioned before, but just to sum up, the dispute between Amanda and Michael was intense. And we can't forget that Melissa Johnson, a girlfriend of Michael who didn't like him, made it clear in the statement, I don't like him, came in and said she had talked to Amanda and Amanda said, I will do anything I can to keep him from seeing the children. I think those are pretty intense words, especially when we find ourselves where we are now. The timing is that Amanda and Michael broke up in March of 2010. There had allegedly been this complaint from Zoe. Michael denied it. I talked about how Zoe put it at a different time later. They break up. Amanda and Michael exchange text messages. Michael says, I'm not letting you take my kids out of state with Louis. And Amanda gets mad about it. And then finally, Amanda calls the police on Michael. After these threats back and forth, this has ex-love, this has custody disputes, and this has money and property disputes. They even had a meeting in June of 2011, it was so heated, with the parents involved. I think it is common sense that divorces can get awful, and so it is very reasonable that Amanda Wasn't the strained relationship with Amanda obviously testified to at length? Isn't the only question this fringe business involving money? It's harder to think that the court didn't understand that this was a strained relationship based on everyone's testimony. Well, there could have been more. We don't know about what the debt was. We don't know the amount of the debt. What if it was huge? What if it was something? What does the offer of proof show? There was no offer of proof. Then how are we supposed to make a determination to reverse a judgment based upon the absence of what the evidence would have shown? All I could say, Your Honor, is that there was absolutely no justification for barring it. So I think it was clear from what is on our record that there was a debt owed to Ms. Conner. And the court said, well, owing a debt to Ms. Conner is enough. It has to be owed to Michael. But that's the best I can answer that question. What I wanted to say about Amanda is that this was no small dispute between these people. And also, the abuse of Lacey did occur, allegedly, after the breakup when Amanda was with Lewis. And I wanted to point out something else the court can see from the videos. During the interview of Lacey, there's a reference to Daddy. And Lacey mentions Lewis as Daddy. And she says she denies that anyone else had ever touched her inappropriately, but then she mentions Lewis and says, he hurt my stomach. And he said, my feet were dirty. He hurt my stomach. I had to take off all my clothes. Why did you have to take off all your clothes, Lacey? I don't know. I think that's pretty intense. And it answers the question, where'd she get the chlamydia? I don't know if I can with a straight face tell this court I don't believe Lacey was sexually abused. I think it's possible, but from the record, I don't know that I can infer that. But if this court is saying she had chlamydia, that reference to Lewis is intense. And it is also intense in telling, I guess is a better word, the reason Lacey was taken to the psychiatrist, it was learned at the trial, was there was one, she excessively masturbates. There was one, she was having ridiculous thoughts. But the one I would like this court to pay attention to is, why was she taken to the psychiatrist? Because she wanted to kill Lewis. And I think that, too, is another piece of the puzzle that should be considered. There is no dispute about that. She wanted to kill Lewis. I had to take all my clothes off for Lewis. I don't know why. He hurt my stomach. Amanda, even if we believe Amanda would protect Michael, even if we believe, which I don't, that Zoe complaint that was given, that was listened to years later, even if we believe that Amanda was willing to not explore Zoe's complaint, because she wanted to protect Michael, if we believe that, it seems like she would stop at nothing to protect Lewis, and we know she would do anything to keep Michael from seeing his children, because she told Melissa Johnson that, and that statement basically went unimpeached. And as I said, Melissa Johnson didn't like Michael. There's a lot here I certainly understand. I'm not arguing to a jury. I'm arguing to this court. But when we look at the reasoning that happened, everything was, well, it didn't have to have physical. I know it was male penis, but it only went in a little bit. Oh, I know she added events, but that doesn't matter. Everything was discarded. When we're talking about proof beyond a reasonable doubt, it wasn't reached here, and for that reason we'd ask on all charges for these convictions to be reversed. Thank you, Mr. Johnson. We'll take this matter under advisement and be in recess.